Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2099 | **DATE** | 5/29/2003 |
| **CASE TITLE** | Gerald Morris vs. Jewel Food Stores, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons contained in this memorandum opinion and order, Jewel's Rule 56 motion for summary judgment is granted and this action is dismissed.(42-1)

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | MAY 30 2003 |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| | | date mailed notice |
| SN | courtroom deputy's initials | |
| | Date/time received in central Clerk's Office | mailing deputy initials |

**Document Number**
60

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERALD MORRIS,                )
                              )
            Plaintiff,        )
                              )
      v.                      )    No. 01 C 2099
                              )
JEWEL FOOD STORES, INC.,      )
                              )
            Defendant.        )

MEMORANDUM OPINION AND ORDER

Gerald Morris ("Morris") has charged his former employer Jewel Food Stores, Inc. ("Jewel") with employment discrimination actionable under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e-17). Jewel has filed a Fed. R. Civ. P. ("Rule") 56 motion for summary judgment, and both sides have complied with this District Court's LR 56.1.[1] For the reasons contained in this memorandum opinion and order, Jewel's motion is granted and this action is dismissed.

Summary Judgment Standards

Familiar Rule 56 principles impose on parties moving for summary

---

[1] LR 56.1 is designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Jewel's LR 56.1(a)(3) statement as "J. St. ¶ --" and to Morris' LR 56.1(b)(3)(B) statement of additional facts as "M. St. ¶ --." Morris' Response to Jewel's LR 56.1(a)(3) statement is cited as "M. Resp. ¶ --," although where a J. St. assertion is not contradicted a citation to the latter ordinarily suffices. This opinion employs the same "J." and "M." abbreviations in referring to the parties' exhibits and memoranda.

judgment the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). And Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986):

> A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

As with any summary judgment motion, this Court accepts nonmovant Morris' version of any disputed facts, but only so long as it is supported by record evidence. What follows in the Background section is culled from the parties' submissions in those terms.

## Background

Morris began working as an on-call part-time driver of a semi-tractor trailer truck for Jewel's Transportation Department in December 1994 (J. St. ¶11). Throughout his time at Jewel Morris was a member of the Chicago Truck Drivers, Helpers and Warehouse Workers Union ("Union") and was covered by Union's collective bargaining agreement with Jewel (id.)

Before May 1998[2] Morris' employment record was free from any serious infractions or discipline (J. St. ¶3). During that time, however, Morris felt that he was being harassed by his supervisors at Jewel (M. St. ¶¶21-26). He claims that he was subjected to supposedly random drug testing with disproportionate frequency and that other Jewel employees were routinely told to follow and check up on him (id). Morris filed a grievance alleging such harassment against one of his supervisors, Dispatch Manager Lyn Ziehlke-Reece ("Ziehlke-Reece"), and it was resolved through Union proceedings (id. ¶26).

On the afternoon of May 2 Morris was driving for Jewel when he parked outside his mother's residence in Maywood, Illinois to drop off her medication (M. St. ¶27). Morris padlocked the trailer, but he left the tractor door unlocked because its lock was broken (id. ¶36). Although disputed by Jewel, Morris claims that Supervisor Larry Ksepka ("Ksepka") had followed him to the house because he arrived soon after Morris got there (id. ¶30). Seeing Ksepka approach, Morris left the house and told Ksepka that he had stopped for 10 or 15 minutes to drop off medicine for his mother (id. ¶32). Ksepka responded that he should finish off his day and later told him not to worry about the incident (id.

---

[2] Because all operative events bearing on Morris' claim occurred in 1998, each date referred to later in this opinion omits the year designation.

3

¶37).³

Ksepka orally reported the May 2 incident to Terminal Manager Frank Karier ("Karier"), who was responsible for driver discipline and had the authority to hire and fire (J. St. ¶¶1-2, 25). On May 4 Karier sent an e-mail to other Jewel managers describing Morris' misconduct and finding that Morris had violated multiple policies and procedures, including leaving a truck unattended and unlocked, illegally parking while on a break, stealing time by taking a break at the start of his shift, taking care of personal business on company time, going home for a break and failing to maintain a current log (id. ¶25). Karier recommended that Morris be placed on indefinite suspension that would be reduced to a three day suspension without pay if Morris showed remorse (id.).

Before any such action was taken, Morris' next work day

---

³ Contesting Morris' account, Jewel has supplied an affidavit from Human Resource Manager Cheryl Nolan stating that she called the Jewel terminal after seeing the truck parked in the residential area (J. St. ¶¶17-21). Ksepka reports that he went out to investigate, found the log inside the truck and learned that Morris was the driver (id.). After waiting 15 minutes, Ksepka called the Jewel terminal and then rang the doorbell of a nearby house that he had been told was Morris' home address (id.). When Morris answered the door, Ksepka questioned him about his conduct, told Morris that he was in violation of a number of Jewel policies and informed him that his workday would be placed in question (id. ¶¶21-22). Because of the operative principles governing summary judgment motions, this opinion will accept Morris' version arguendo even though an evaluation of the credibility of the two stories (impermissible for Rule 56 purposes) might well point the other way.

(May 5) arrived (J. St. ¶26). At the terminal that morning, Morris performed a pre-inspection of his vehicle, checking the lights, breaks, blinkers and tires (M. St. ¶38). Morris had not been trained to inspect the trailer for body damage, and he says that because many of the trailers were dinged up, drivers were required to report only major damage (id. ¶¶38-39). Because the fifth wheel (the mechanism by which the trailer hooks onto the tractor) was not locking properly, Morris drove to the safety lane, where a mechanic took care of the problem (id. ¶41).

After completing his morning deliveries, Morris was driving 10 miles off of his delivery route when the trailer came apart from the fifth wheel and separated from the tractor (M. St. ¶46). Morris and another Jewel driver attempted to reattach the trailer and reported the accident (id. ¶47). Upon arriving at the scene, Ksepka noticed a large dent in the trailer (J. St. ¶¶28-29). Morris said that he had not inspected the body of the trailer before his run and had not noticed the damage (id. ¶29; M. St. ¶29).

Back at the terminal, Ksepka and Karier met with Morris and his Union representative and began to question Morris about his day and why the accident occurred off route (J. St. ¶¶31-34). Morris explained that he was off route because he had hit traffic and was on his way to lunch (id. ¶33). Morris then informed Karier and Ksepka that he had been injured in the accident, and

5

the discussion was stopped so that Morris could seek medical
attention (id. ¶34). Ksepka documented an account of the Route
53 accident in a memorandum to Karier dated May 13 (id.).

Over the next few days Ksepka investigated the cause of the
damage to the trailer. By reenacting one of Morris' May 5
deliveries, he found that the dent on the vehicle exactly matched
damage to a post at a Glenview Jewel store (J. St. ¶35). Ksepka
concluded that Morris had hit the post and damaged the fifth
wheel by attempting a tight left-hand turn into an alley, rather
than backing into the alley (id. ¶¶35-38). Ksepka submitted his
findings in a May 27 report to Karier (id. ¶38). Karier also was
told by a garage mechanic that the damage to the fifth wheel
resulted from a serious wrenching at a stopped position (id.
¶39).

As a result of his injury Morris was out of work until
October (J. St. ¶42). While out Morris made repeated efforts to
speak with Karier about the incidents, but Karier refused to
speak with him until he returned to work (M. Resp. ¶41). Karier
says that he did not want to make a decision about Morris'
discipline until Morris returned to work and had an opportunity
to explain his actions (J. St. ¶41). As a result Morris claims
to have been unaware that he was subject to possible disciplinary
action until September 1998, when he tried to return to work (M.
St. ¶50).

Morris returned to work and met with Karier and Union representatives on October 26 to discuss the May incidents (J. St. ¶42). Morris denied any wrongdoing (id.). He said that it did not occur to him to inform management that he was taking a break on May 2 because he was at his mother's house for only 10 to 15 minutes to drop off medicine for her (M. Resp. ¶44). As to May 5, Morris denied that he hit anything at the Glenview store, explaining that as an experienced driver he knew to back into the alley rather than attempt the left-hand turn (id. ¶¶35-40). He claimed that the damage had already been done when he left to make the deliveries (id. ¶¶46-47).

In addition to the May 2 infractions, Karier found that on May 5 Morris had violated Jewel's policies by failing to pre-inspect his vehicle properly and by failing to report an accident at the time it occurred (J. St. ¶48). Based on Morris' rule violations as well as Karier's belief that Morris was lying in the face of conclusive evidence against him, Karier placed Morris on indefinite suspension (id. ¶49). On November 5 Karier met with Morris, Terminal Supervisor Rick Simmons and Union representatives and terminated Morris (id. ¶¶50-51). Documenting that meeting in a November 17 memorandum, Karier explained that he had upgraded the indefinite suspension to termination because Morris' rule violations and his denials of responsibility had caused Jewel to lose trust in him as a driver (id.).

7

Morris filed a timely EEOC charge of race discrimination, and on July 23, 2001 the EEOC issued a right-to-sue notice. Morris then instituted this action, asserting that Jewel had unlawfully terminated him because of his race.

## Race Discrimination

Where as here a plaintiff presents no evidence--either direct or circumstantial--of race discrimination that of itself supports a reasonable inference of unlawful discrimination (Troupe v. May Dep't Stores Co., 20 F.3d 734, 736-37 (7th Cir. 1994)), he or she must attempt to create a presumption of such discrimination (Loyd v. Phillips Bros., Inc., 25 F.3d 518, 522 (7th Cir. 1994)). Hence Morris' claim must be evaluated under the familiar McDonnell Douglas v. Green, 411 U.S. 792, 802-07 (1973) burden-of-production-shifting line of analysis.

Under that approach Morris must establish[4] a prima facie case of race discrimination by demonstrating that (1) he was a member of the protected class, (2) he was performing his job to his employer's legitimate expectations, (3) he was subjected to an adverse employment decision and (4) he was treated less

---

[4] At this summary judgment stage, of course, Morris need not "establish" or "prove" or "show" anything. Instead he must merely demonstrate the existence of a genuine issue of material fact to defeat Jewel's summary judgment motion. Although this opinion will nonetheless most frequently employ one of those quoted terms because that is the terminology used by the cited cases, this Court has consistently imposed that lesser burden on Morris in testing his claims.

favorably than similarly situated employees outside the protected class (Logan v. Kautex Textron N. Am., 259 F.3d 635, 639 (7th Cir. 2001)). If Morris meets those requirements, a rebuttable presumption of discrimination arises and the burden shifts to Jewel to articulate some non-discriminatory reason for its actions (Loyd, 25 F.3d at 522). If Jewel does so the presumption dissolves, and Morris (who always retains the burden of persuasion) must establish that Jewel's asserted reason was pretextual (id.).

Morris clearly meets the first and third requirements of his prima facie case: He is African-American, and his termination was of course an adverse employment decision. But Morris fails the fourth requirement, because he has not shown that an employee outside the protected class was treated more favorably. Even more importantly in ultimate terms, Morris has not created an issue of material fact that could undermine Jewel's stated reasons for his termination, so that no reasonable jury could find those reasons were a pretext[5].

Morris' prima facie case is flawed because he has failed to

---

[5] As the ensuing discussion reflects, the same analysis that defeats Morris on the issue of pretext vel non is also fatal to the second element of a prima facie case--that relating to the employer's legitimate expectations. But as both this Court (see, e.g., Peyton v. Otis Elevator Co., 72 F. Supp. 2d 915, 919 (N.D. Ill. 1999)) and our Court of Appeals (see, e.g., Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 600-01 (7th Cir. 2001)) have frequently done, on that score this opinion has moved directly to the dispositive failure to show pretext.

9

demonstrate that he was treated less favorably than similarly situated employees. In general, plaintiffs must normally show that such employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)). Even if not every one of those factors is a sine qua non to success on that element, in all events "a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct" (id. at 617). Morris flunks that test.

Morris has identified a number of Jewel drivers who had violated company policies and were not terminated. Like Morris, from 1995 to 1999 all were under at least the indirect supervision of Terminal Manager Karier, and it is uncontested that Karier had the authority to hire and fire (J. St. ¶1). Although Morris was an on-call driver and therefore was not entitled to the 40 hours a week guaranteed to the permanent employees, there is nothing in the record to suggest that he would be subject to different disciplinary standards for driver misconduct as a result of that status[6]. Despite those

---

[6] Although Ziehlke-Reece testified that brand new drivers could be disciplined more harshly than veteran drivers, that claim was not made about on-call or part-time employees such as

10

commonalities, however, a review of the conduct of the identified drivers reveals that they either were not similarly situated to Morris or were not treated less favorably.

First, Morris looks to Robert Bertolini ("Bertolini"), a white driver for Jewel who on two consecutive days in January 1998 took his loaded truck home to conduct personal business, left his truck illegally parked, was off-route and violated break and lunch policies (M. St. ¶70). Bertolini had been previously warned about such misconduct and received a three-day suspension.

Jewel does not contest that Bertolini's violations were similar to Morris' May 2 infractions, but it rather asserts that Bertolini was not similarly situated to Morris because of Morris' ensuing May 5 conduct[7] and his lack of remorse for his actions. In response, Morris claims that Bertolini was similarly without remorse, relying on Bertolini's disciplinary write-up that reflects that he did not fully agree with Jewel's policies. But that same report goes on to say that "Mr. Bertolini admitted to being in violation of the company's policies and vowed not to be in violation again" (J. Ex. 4, Karier Dep. Ex. 6). No evidence

---

Morris (Ziehlke-Reece Dep. 47).

[7] Jewel's disciplinary records for Bertolini do reflect that he was in at least two avoidable accidents in the early 1990s. But those infractions occurred before 1995, when Karier became Terminal Manager and hence the disciplinary decisionmaker. Thus for those incidents Bertolini was not similarly situated to Morris.

shows or even implies that Morris ever admitted to any wrongdoing or acknowledged culpability for his actions (as did Bertolini). According to Karier's May 4 e-mail, Karier was prepared to treat Morris in exactly the same way as Bertolini--resolving his indefinite suspension to a three-day suspension if he had a remorseful attitude--and that was so until Karier learned of Morris' additional infractions on May 5.

Thus Morris has not raised a genuine issue of fact to refute why such distinguishing circumstances between Morris and Bertolini did not legitimately occasion Karier's imposition of different discipline for the two drivers. As such, Morris has failed to show that he and Bertolini were similarly situated.

Next Morris identifies Frank Qualiter ("Qualiter") as a white employee who, according to Morris, was treated more favorably in light of Qualiter's poor driving record. Over his ten year employment with Jewel, Qualiter had approximately 27 accidents, several of which were avoidable and unreported, as well as numerous attendance, inspection and procedural violations (M. St. ¶56-63).

While most of Qualiter's accidents and other disciplinary problems occurred before Karier became Terminal Manager in 1995, at least three of his accidents occurred during the period of Karier's supervision (J. Ex. 4, Karier Dep. 13). Morris' R. Mem. 9 claims that Qualiter was given "a slap in the hand" despite his

dismal performance record. But it is undisputed that Karier terminated Qualiter because of one of his three accidents.[8] And that fact undercuts Morris' argument that Qualiter was granted preferential treatment (in that respect, Logan, 259 F.3d at 639 held that an African-American plaintiff failed to satisfy the fourth McDonnell-Douglas criterion because white employees were also terminated in similar manner).

Nor can Morris salvage his argument by claiming that Qualiter was treated more favorably because he may have been given more chances before he was terminated. In that regard Morris has pointed to no evidence from which a jury could reasonably infer that Qualiter denied having his accidents or that Karier believed that he was lying about his conduct. By contrast, those aspects of Morris' violations directly led to his termination and thus legitimately distinguish Qualiter's conduct. So even if Morris had shown that Qualiter was treated more favorably (as he has not), Morris has failed to raise a reasonable inference that the two were similarly situated.

Morris' references to other white drivers who had accidents or who otherwise violated Jewel's policies are similarly unavailing. Although a number of them had accidents and were not terminated, as was Qualiter, Morris has put forth no evidence

---

[8] In fact, Karier testified that he sought to terminate Qualiter for another of the accidents but did not because the Union protested (J. Ex. 4, Karier Dep. 90-91).

that any of them refused to acknowledge their culpability in violating Jewel's policies. Again that constitutes a failure to demonstrate that they were similarly situated to him.

But suppose that all of this had not been so--suppose that Morris had not fallen at the hurdle posed by the requirements of a prima facie case, as he has. Morris' case would still fail, for he has not raised the necessary inference that Jewel's reason for firing Morris was pretextual. As detailed above and in Karier's November 17 memorandum, Jewel's stated reason for terminating Morris -- that he violated numerous Jewel policies and refused to admit his misconduct -- is surely a legitimate business reason for terminating an employee. To establish that Jewel's reason is a pretext, Morris must show either that Jewel was more likely motivated by a discriminatory reason rather than by its proffered reason or that its proffered reason is unworthy of credence (McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 372 (7th Cir. 1992)).

First, Morris disputes that he committed some of the alleged infractions and offers explanations for the remaining charges. But even when, with all properly supported facts being viewed in the light most favorable to Morris as Rule 56 commands, Morris' account of the May incidents is credited, he has still failed in his effort to discredit Jewel's proffered reason. As Wade v. Lerner New York, Inc., 243 F.3d 319, 323 (7th Cir. 2001) has

14

taught, quoting McCoy, 957 F.2d at 373:

> In describing a plaintiff's burden in this context we have explained that "the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers."

It therefore does Morris no good to argue that he did not do the things that he was accused of doing or that his violations were exaggerated. Rather he must demonstrate that Karier did not honestly believe in the reasons given for Morris' termination. And on that score Morris' showing falls woefully short.

As in Wade, ultimate decisionmaker Karier relied in large part on the reports of Morris' immediate supervisor Ksepka. Those reports provided Karier with Ksepka's account of Morris' May 2 infractions, his description of Morris' fifth wheel accident on May 5 and the basis for his conclusion that Morris had been in an earlier unreported accident in Glenview on May 5 that had caused the damage to the fifth wheel. In addition, Karier obtained corroborating information directly from a Jewel mechanic regarding the cause of the broken fifth wheel. In response, Morris has offered no evidence other than his own word and his experience as a driver. And that showing is plainly insufficient to raise a reasonable inference that Karier did not honestly believe in Ksepka's presentation of the facts as bolstered by the mechanic's opinion.

Next, pointing to slight inconsistencies in Jewel's account

15

of the May incidents, Morris attempts to raise an inference of Jewel's general untruthfulness with respect to his termination. Morris notes that Ksepka's affidavit states that on May 2 he called and asked Karier to find an address for Morris in Maywood, but that in his deposition Ksepka testified that he had spoken to a different Jewel employee. In addition, Morris points out that, although he had given out his mother's phone number to Jewel as his own and he sometimes did live at her home, the Maywood house was not the address listed in his Jewel personnel file.[9]

Those minor discrepancies, if buttressed by reasonable pro-Morris inferences, may perhaps provide sufficient record support to credit Morris' version of the May 2 incident over Ksepka's for Rule 56 purposes. But that is not enough to show pretext here. Even if it were accepted as true that Ksepka followed Morris to Maywood from the Jewel terminal, it remains undisputed that Morris violated Jewel policies by leaving his truck unattended and by taking care of personal business on company time. More importantly, Morris' account of the May 2 incident does nothing to call into question Karier's honest belief, as expressed in

---

[9] Morris also argues that Ksepka's May 27 memorandum stating that his investigation of Morris' infractions was complete conflicts with Karier's testimony that he wanted to wait to speak with Morris until he was back to work before making his disciplinary determination. But that charge of inconsistency is unpersuasive--it is rather that Karier first sought to speak with Morris directly, instead of automatically accepting Ksepka's rendition of Morris' explanation for the incidents.

Karier's May 4 e-mail, that Morris had violated Jewel policies and should be disciplined.

Lastly, Morris' other efforts to demonstrate pretext are likewise unsuccessful. As described above he has failed to identify similarly situated employees who were treated more favorably by Karier[10]. That Jewel's managers have discretion to discipline driver misconduct depending upon the circumstances does not help Morris' case, because he has not shown that Jewel discriminated against him in exercising that disciplinary discretion. Nor can Morris establish pretext by recounting his earlier claims of harassment, because those allegations are totally unconnected to Karier and to his decision to terminate Morris for the May incidents. In sum, Morris has failed to demonstrate that Jewel's proffered reason is unworthy of credence.

## Conclusion

Morris has failed to present evidence from which any reasonable inference of racial discrimination may fairly be drawn. In Rule 56 terms, he has not shown a genuine issue of material fact, so that Jewel is entitled to a judgment as a matter of law. Its summary judgment motion is granted, and this

---

[10] That Jewel employee Alan DalPonte may have provided Morris with the names of those white employees (M. St. ¶¶53-54) does not change the above analysis, which has concluded that they were not in fact situated similarly to Morris.

action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 29, 2003